MR. BIRD. Good morning, Your Honor, and may it please the Court. This Court should reverse the judgment below and remand with instructions to dismiss this case because the controlling regulation which is found in Section 31205-6J of Title 48 of the Code of Federal Regulations requires that all types of pension costs expressly mentioning and including segment closing adjustments at issue in this case must be timely funded to be allowable costs, and Raytheon has never funded these costs. MR. BIRD. Can I ask you when either generally or in specific discussions with Raytheon the government first articulated the position that the segment closing costs needed to have been funded before the two tax returns were filed? MR. BIRD. That was in the first specific mention, Your Honor, was in September 30 of 2004 when the contracting officer sent four letters to Raytheon saying, we do not intend to fund any of these, we do not intend to pay any of these segment closing adjustments because you haven't funded them. In response, Raytheon then submitted its certified claims under the Contract Disputes Act, and the contracting officer then denied them again for lack of  MR. BIRD. Right. In September 2004, as I understand it, tell me if this is right, that I think there were three segments at issue here, and for two of them, the tax returns with extensions were due in September 2002, and for the third, the optical one, I guess, it was due in September of 2003. So, I mean, yes, in 2003. So only after the time at which Raytheon could have performed the required funding did the government inform them that that timely funding was in fact required? MR. BIRD. The timing is correct, Your Honor, and the regulation, it's been true for 40 years that under the regulatory regime that if you don't fund pension costs, they are not allowable either in that year or in any year thereafter. That's been an unswerving requirement of the Federal Acquisition Regulation. MR. TONER. Why is there no, at least as far as I've seen, it's like it's partly a question, is there any evidence in, before the August 1994 guidance, that I know articulates it, is there anything in any case, not just Raytheon specific, anywhere in which the government made this point that the FAR timely funding requirement applied to the segment closing costs before that August 1994 guidance? MR. BIRD. Just to be clear, Your Honor, I think it was in July of 2004, the particular guidance that they were referring to. And I'm not aware of any specific written guidance other than the regulation itself, which, as I mentioned, is clear on its face, and it's particularly been clear since October of 1998 when the regulation was amended. The particular regulation, 6J, was amended to specifically list segment closing adjustments as one of the types of pension costs that were subject to the timely funding requirement. The addendum to our brief, addendum 3 at page 575, has the applicable regulation. The key sentence is, there are a number of sentences, but the key sentence is the sentence at the end of paragraph 6J2, which says, pension costs are allowable subject to the reference standards, referring to the CAS 412 and CAS 413, which are the two standards that govern pension costs, and the cost limitations and exclusions set forth in paragraphs J2I and J3 through J8. Now, J2I is the one that sets out the timely funding requirement. It says that it requires that all pension costs be timely and that the costs are not allowable in that year, and it goes on to say, pension costs assigned to the current year, but not funded by the tax return time, shall not be allowable in any subsequent year. That's one of the requirements for allowability. The others are set forth in J2, J3, through J8 that apply to specific kinds of pension costs, for example, the cost of employee stock J4 specifically says segment closings, refers to segment closings, and contains additional limitations in addition to the funding requirement that have to be met in order for the cost to be allowable. Mr. Byrd, when I read J4, it just seems to do little more than refer us back to CAS 413, and then if we read CAS 412 and CAS 413 in a way that segment closing adjustments are not pension costs, then what do we do there? We ought to be, if segment closing adjustments are not pension costs for purposes of CAS 413, which is an issue. The reason is that the FAR reigns supreme on matters of cost allowability based on this Court's decisions almost 30 years ago. And the FAR regulation, the Federal Acquisition Regulation, we've been talking about, specifically says that pension costs are allowable subject to three requirements. You have to be timely funded under J2I. And the third one is you have to comply with the specific limitations applicable to various kinds of pension costs. J4 mentions, specifically refers to segment allowability of pension costs. So even if Raytheon were correct, and we would vigorously dispute that Raytheon is correct, that the segment closing adjustment is not a pension cost for purposes of the CAS, the FAR makes segment closing adjustments that are unfunded, not timely funded, unallowable costs. So if it is some kind of a non-pension cost, it doesn't matter because the FAR, which reigns supreme on questions of allowability, has said segment closing adjustments that are not timely funded are not allowable costs. Can I just ask you the legal question that takes as a premise something that I know you dispute. You've argued that the FAR is actually quite clear. Assume with me for a moment that I found the combination of the FAR and the CAS not terribly clear. Then I'm thinking, does this case fall into that category of cases in which a new regulatory interpretation can't be any longer do anything to come into compliance? That is, in this case, after the September 93 second tax filing. I would say that, as the Court recognized, that is not a premise that we believe is correct. But accepting the premise, I'm not sure that we have a new regulatory regime. We have a new regulatory requirement. As of 1971, it's been true for 40 years. We have a specific amendment in 1998. But some of those cases at least talk about new regulatory interpretations. And hence, the premise of the question, which I do appreciate you dispute, that the regulations themselves are not clear and that there was no pre-July 1994 announcement of the government's interpretation of the regulations. And by then, they'd already filed their tax returns. I guess one point, Your Honor, is the interpretation of the joint guidance in 2004 was not any authoritative statement by the Federal Acquisition Regulation, by the Federal Acquisition Council, by the FAR Council. It was the guidance provided by two agencies, the defense contract audit agency and the defense contract management agency. But that even makes it, I mean, that can't help you, right? Well, I would go back to the point of the clarity of the regulation itself. On what basis could the Court reasonably construe that the timely regulation is specifically mentioned as one of the, it's J-4 and you have to comply with the additional requirements of J-3 through J-8 as applicable? Well, J-4 specifically mentions segment closings. So for that reason, I think the regulation is clear on its face. And there was certainly never any contrary interpretation issued by any of the agencies involved upon which Raytheon could reasonably or any contractor could reasonably have relied. The regulation was there by 2004. It had been there for six years. Realizing that our case in Direct TV was decided in a different context, what's its implication in this case? I don't think it really has any implication, Your Honor. Direct TV involved a pension surplus in which the government was asserting a claim. Wasn't the issue there also the definition of pension costs? The issue there, Your Honor, was, well, there are actually two issues. One was whether the segment closing adjustment applied to the entire deficit, the entire surplus in a situation in which the contractor had transferred part of the surplus assets and liabilities. In this case, Raytheon retained all of the assets and liabilities of the pension plan, so there was no transfer issue. That was also a surplus case which did not involve the funding requirement because the funding requirement is a requirement that is imposed upon contractors. Before they could charge the government, they have to actually fund the pension cost by paying it into the pension fund. There's no comparable requirement that applies to the government. We're into your rebuttal time, and you reserve five minutes for rebuttal, correct? Yes, Your Honor. Do you still have a green light there? Oops. Sorry, Your Honor. You're into your rebuttal time, but we'll restore you back to your original five minutes. Thank you very much. I misread the light. Okay. Ms. Manos. Yes, Your Honor. Thank you, Your Honor. Good morning. Karen Manos on behalf of Raytheon Company. Contrary to what my friend, Mr. Brewer, just told you, a segment closing adjustment is not a pension cost, and so the Federal Acquisition Regulation's timely funding requirement is not applicable. Can you walk through or just explain what you do with J-4? Yes, Your Honor. I'd be happy to. Your Honor, I don't read J-4 as applying to a segment closing adjustment. I read J-4 as just saying the annual pension cost that you contribute to your pension plan, to have that be reimbursed by the government, that has to be funded. But this is not a question of cost allowability. This is a question of measurement. The dispute is not over whether this is an allowable segment closing adjustment. I'm sorry. Those kinds of generalities are not actually helping me either way in this case. So I would like you actually to talk to me about J-4 and its specific language and connect all of the dots to indicate why a section that's in this J section that's specifically about segment closings doesn't support the government's position on this. Your Honor, if I may, a very detailed argument, but one I think gets us even closer to the point, which is that the J provision altogether says that you have to comply with C.A.S.S. 412 and 413. C.A.S.S. 412 specifically defines the components, the pension cost. This Court has held in the United States there's a Boeing Company case that C.A.S.S. 412 together with 413 govern, quote, the determination and measurement of pension costs. The Cost Accounting Standards Board by statute has the exclusive statutory authority to prescribe, amend, and rescind cost accounting standards governing the measurement, assignment, and allocation of pension costs. Ms. Manos, I'm sorry. Maybe I'm being impatient, but I really want to hear how J-2 and J-4, as they work together, don't support DOJ's argument here. J-2 identifies certain things as being pension costs, and then it appears that J-4 is one of those identified pension costs. How does that work? Your Honor, if you look at all the different paragraphs within J, Mr. Byrd is saying they're all pension costs, but they're clearly not all pension costs. For example, the employee stock ownership plan doesn't necessarily have to be a pension cost at all. It's something entirely different. So I think it's just the way the regulation was set up. I don't think it says every one of those paragraphs is a pension cost. I think that's a misreading of the regulation. But I think our point is... Are there any of the paragraphs other than J-4 in which, and maybe even J-4 is an exception to this, in which items could be pension costs? That is, the employee stock ownership. I mean, could that be a pension cost? Your Honor, it could be a pension cost, and actually in the more recent regulation that's they've now taken it out to say it's not part of pension costs. Right, but is your position that the J-4 in referring to the segment closings, terminations, those are never pension costs? No, Your Honor, the point is not that they're never, but that it's not intended to define what is a pension cost. It's saying if it's a pension cost, you do have to fund it. Right, but why, if it would never be, would you put this in a subsection that discusses pension costs? Your Honor, J just happens to cover where they put all the pension cost issues. And the fact that the employee stock ownership plans was in there was realized later to be a mistake because it caused the Armed Services Court of Contract Appeals to go down different lines if something was an ESOP versus something wasn't. So they ultimately removed it. So I'm not sure a whole lot of thought went into other than the fact that J just happens to be where all the pension cost rules have been. But I think, with due respect, Your Honor, I think the real important point is that even if the FAR says that, it wouldn't ultimately matter because the CAS Board has not only the exclusive statutory authority to define the measurement of pension costs, but even more important than that, 41 U.S.C. 1504c says that costs that are the subject of a cost accounting standard, quote, are not subject to regulations established by another executive agency that differ from those standards with respect to the measurement, assignment, and allocation. So even if Mr. Byrd is correct that that's what the FAR says, if there's a conflict or even a difference, the CAS reigns supreme. So his premise that the FAR allowability reigns supreme is absolutely wrong. By statute, the CAS Board has an exclusive statutory authority. The FAR counsels can't play in this game at all. Even if they defined it as a pension cost, if it differs from the CAS definition, it's too bad. The statute says it cannot happen. So if we were to write an opinion affirming you, we would have to say J-4 is a dead letter? Your Honor, we wouldn't say it was a dead letter. We would say, first of all, either is or isn't it a segment closing adjustment. But what this Court has done is tried to apply a presumption in favor of finding regulations in harmony. And I think you can read them in harmony by saying it doesn't really define what a pension cost is. It says if it is a pension cost, it has to be funded. But it actually, as you noted earlier, refers you right back to CAS 412 and 413. And even as recently in the General Dynamics case where this Court talked about the intra-year funding assumptions, you went back to the old Boeing case that says CAS reigns supreme. And in that case, you were talking about a different part of the Federal Acquisition Regulation. But you said to the extent that the Truth in Negotiations Act regulations in the FAR conflict with CAS, the CAS takes precedence. Well, the very same thing is true here. But the trial court's decision in Viacom had two other compelling reasons why the FAR ultimately doesn't matter. And the government has completely ignored those in its briefs. One is that under revised CAS 413, it specifically allows a price adjustment to fixed price contracts. As this Court recognized in the Rumsfeld v. United Technologies Corporation case, allowability only applies to cost reimbursement contracts. It doesn't apply at all to fixed price contracts. So it doesn't matter what the FAR says ultimately. And then thirdly, the trial court recognized that under revised CAS 413, it says that the government's share is allocable without limit as a creditor charge. Without limit is very clear. And it doesn't mean that if you don't fund it by the time for your tax return, you cannot recover. That would be completely inconsistent. Can I ask you, I guess, a version of this timing of clarification or government position. Are you aware of any government announcement or regular understanding in the industry before July of 2004 where segment closing costs were not paid because they hadn't been funded before the tax return? Absolutely not, Your Honor. And the July 2004 guidance was coordination with the Department of Justice and specifically the trial team that was litigating all these pension cases. So we think it's bogus guidance to begin with. But it was a rule that would effectively mean that the government would never pay a pension deficit. And the trial court recognized that in their other decisions that nobody can fund the entire amount of the deficit in the year of the segment closing just for tax reasons. You can't put that much money into your pension plan. It's pension plans people contribute in accordance with ERISA, the amount year after year. They don't just put a whole slug of money in at the time. But to say you can't make a claim against the government unless you put all the money in up front was just a way of doing an end run around having this rule apply equally to both parties. And so people were, it was a controversial guidance. We don't think it's applicable to anyone. But certainly Raytheon never knew about it and I don't think anyone else in industry knew about it either. And it was only after that guidance came out, Raytheon had some segments with surpluses, some with deficits. The at the end of the day one guy would write a check, not both. It was not until that guidance came out that the government said, sorry, we're not going to pay for any of the pension deficits, but you pay us for the pension surplus. Can I switch issues? And I want to ask you a couple of things about the equitable adjustment, even though maybe the government should have spoken first on this. First question, can the government do anything about that now? Your Honor, now I think the answer is no. The statute of limitations is run. This was clearly a case where there's a... Can you just explain to me the process by which you go or don't go to the contracting officer? Yes, Your Honor, I'd be happy to. Under the Contract Disputes Act, all claims by the federal government against the contractor have to be the subject of a final decision. And so what happens is if the government's asserting a claim, the contracting officer will issue a final decision saying you owe us X amount of money. I mean, I guess this is an embarrassing bit of ignorance on my part, but the government and the contracting officer, there's two different people, two different... I'm sorry, Your Honor. I mean, I'm really... No, I apologize, Your Honor. The contracting officer belongs to the government. It's somebody with a contracting officer's warrant who's authorized to make these decisions on behalf of the government. And so here Raytheon had a segment closing claim under CAS 413. So when the government said we're not going to pay, Raytheon submitted certified claims under the Contract Disputes Act to the contracting officer. The contracting officer just outright denied all those claims saying, you didn't fund it, we're not going to pay it. Once the contracting... Once you have a government... a contractor claims submitted to the contracting officer for a final decision and a final decision, that triggers your right under the Contract Disputes Act to appeal. Raytheon files a complaint in the Court of Federal Claims. Can I just stop you right there? You said the contracting officer denied all the claims. I guess it's your position that the contracting officer should have also said, in the alternative, if I ever get reversed by some court reviewing my decision, in the alternative, I want to point out that there should be some kind of equitable adjustment here. And by virtue of the fact that he or she didn't do that, the government's out of luck on the equitable adjustment theory? Your Honor, the proper way to have done it would have been to deny the claim for some reason other than this bogus funding theory that they thought of. They should have said, you didn't properly compute it in accordance with CAS, or we are entitled to an offsetting counterclaim and equitable adjustment under a completely different regulation, 48 CFR 52230-2, and actually asserted a claim for that. And this rule is going to work both ways. The segment closing adjustment has a very specific formula for determining the deficit. This court has never held it, but the trial court has held that that's a change in cost accounting practices when you apply it. That triggers the right to an equitable adjustment under this entirely different regulation. If the contracting officer and the government are, for all practical purposes, the same, then why should we hold the government to make a claim to itself? Your Honor, the statute itself says that. It says that all claims by the federal government against the contractor have to be the subject of a final decision. The government itself is much larger. The contracting officers are very specific people who have contracting officers' warrants. Where does it say that, that the government has to bring a claim? We have this one case, Maropakis, that says, yes, the contractor has to bring those claims in front of the contracting officer. Your Honor, it's at 41 U.S.C. 7103-A3. And this court has been very clear that it's a jurisdictional requirement that you have to have a contracting officer's final decision on a claim. That applies to contractor claims, government claims, and government counter claims. This is a government counter claim. So in this case, when the government said, we're not going to pay on this, that's not enough to give notice as to some sort of equitable adjustment in the future? Exactly, Your Honor. An equitable adjustment is something different. It's a different claim entirely. It's essentially a counter claim. The government's trying to pretend that it's all one claim, that what should happen is that we should pretend that instead of Raytheon asserting a claim and the government asserting a counter claim in response, that we should just meld them all together, which is what their guidance does. It's a procedural shortcut where we sort of skip that step and we say, well, we're not going to bother issuing a final decision on the counter claim. We're just going to do a mathematically equivalent equation. And so again, on the facts here, you would have, you wanted the contracting officer to say, not only am I denying your there is an equitable adjustment theory the government can have should there be deemed to be some kind of deficit to the pension. Exactly, Your Honor. The same thing would apply in a surplus. The contractor would have to do the same thing. Is that what contracting officers do? I'm just trying to understand this area. Your Honor, a contracting officer, if the government has a counter claim, the contracting officer would assert either in that same final decision or in a separate one, they would actually assert a government claim against the contractor. And it happens frequently. It comes up in litigation where the government would want to assert a counter claim. Is that claim asserted on the basis of a formal notice from the government? Your Honor, the formal notice is in the form of the contracting officer's final decision, which is a very formalized document. It gives the contractor the appeal rights. It says, this is the amount I've determined. It explains the reasons for it. That starts the clock running. I mean, it's a very strict period, 90 days to appeal to one of the boards of contract appeals, one year to go to the court of federal claims. You had reserved three minutes here, time for cross appeal, I believe. Yes, Your Honor, if I could just real quick on the optical segment. This, to use Mr. Byrd's checkbook analogy, we had party A, the plan itself, the non-bargaining plan had been in existence for 40 years, covered tens of thousands of participants, had a very large surplus when the optical segment was created. No assets were acquired during that transaction. Those people were added with zero assets and zero liabilities. All the new hires into the optical segment came in as non-contributory persistence, zero assets and liabilities. So we've got this massive checkbook. They're immediately starting to write checks. No money is going in. If you're keeping track of it on a checkbook basis, it's obvious those guys are in a deficit. The trial court made two fundamental errors in construing the regulation. First, she used the fact that the 41350C52 method resulted in a surplus to attack the calculation under 41350C51. The fact that C52 results in a surplus doesn't tell you anything at all about whether the segment does. It just piggybacks on it. And separately, she said you can't separately calculate the assets and liabilities. Okay, we'll restore three minutes of the House appeal time. Mr. Byrd, you have five minutes. Thank you, Your Honor. Let me address first the timely funding requirement because for the reasons set out in our brief, that issue is dispositive of this entire case. If the court decides in accordance with the government arguments on that issue, then this case is over. And there are really only two issues there. One, does the government apply to the segment closing adjustments? And two, if it does, as we believe is the case, did Raytheon fund these? Let me ask you a hypothetical. What if I were to conclude that CAS 412 and CAS 413 together are unambiguous about how CAS chose to define what a segment misunderstands or misreads what CAS 412, 413 call for and then comes up with this J provision, J2, J4, and says pension costs as identified through J3 through J8, those are pension costs. What do we do there if FAR, in our view, misreads CAS 412, 413? Or could J2 be read as saying any pension costs as identified in J3 through J8, those are not allowable? And then would there be a way to say, well, you can't, J4 actually isn't a pension cost. And so therefore, it's not some way to invoke the timely funding requirement for segment closing adjustment. John, I think on that assumption, it really goes the other way. If the CAS unambiguously defined a segment closing adjustment as not being a pension cost, it would make no difference because the FAR, which controls allowability, has said the segment closing adjustment is subject to the requirements of J2, J2I, that's the timely funding requirement. And that ends the case, in our view, because there's no way out of that. The CAS can define, and we, of course, would dispute that this is an issue about the measurement of cost at all. The CAS actually includes segment closing adjustment. And the whole premise of the argument to the contrary is that the segment closing adjustment is not listed as one of the four elements of the annual computation of pension costs. Well, of course it isn't. You only close the segment once. That's not going to be part of the annual computation of pension costs for the plan. But in any and all events, the critical issue is, what does the FAR say? Because the FAR controls allowability, and the FAR unambiguously says segment closing adjustments, whether or not they're pension costs, have to be timely funded to be allowable costs on government contracts. So when there's conflict between the FAR and the CAS on measurement and how you allocate costs, would the FAR control that too? If there's a conflict on measurement, no, Your Honor. It's really like separate silos, if you will. The exclusive authority on allowability is the FAR. The exclusive authority on the measurement, assignment, and allocation of cost is the CAS. But if the CAS defines the segment closing adjustment as something different from a pension cost, then the court might well ask, well, if not, what is it? Of course it's a pension cost. It's the cost of a pension plan. But putting that to one side, even if that were the case, the FAR has spoken, and the FAR has said, this thing called a segment closing adjustment has to be timely funded. And I think the argument made clear that Raytheon has no effective answer to the argument under J4. That is dispositive of the issue. And I would like to very briefly respond on the optical segment issue. On optical, Your Honor, what the court found, correctly found, on findings of fact that Raytheon does not challenge on this appeal, that Raytheon did not have the readily determinable data that it needed to use the method that it chose to use under the so-called C5-1 method. And because of that, again, that ends the case. Because Raytheon's arguments are simply suggestions that they don't like that result. They don't think it's fair. Well, the regulation is mandatory. The regulation is mandatory. The data has to be accounted for before you can use C5-1. There's no opportunity for any little fill-in estimates. The court does not have to reach that question in order to affirm this judgment below. But if the court does reach that issue, our view is based on the dictionary, ordinary plain meaning of determine, and the other materials in our brief, that estimates are not hypothesizing, they're speculation, they're guesswork, they're not actually, actual readily determinable data. And in fact, the trial court correctly found in this case that of the four items of data that Raytheon needed to have for the 11 years of the optical segment's existence, Raytheon had exactly none of segment-specific data. And for that reason, the trial court correctly concluded that Raytheon could not use the method that requires readily determinable data for those four items of data for the 11-year period. And for that reason, we believe this court should affirm. Can I just ask you one question, which may not be important at all? Can you explain what a particular phrase is doing in the little ii, that the phrase shall be allocated to the segment as of the earliest date such data are available? Yes, Your Honor, that's the alternative method that we're talking about. What that means is the previous version of the regulation did not have that language. What it had was you allocate under C-5-1 if you have the readily determinable data, otherwise you allocate on a different basis. In the amended version in 1995, what that provides is, let's assume you only have data going back for five years for a segment that's been in existence for 15 years. What the amended regulation requires in that part that Your Honor is referring to is that you don't allocate as of the date of the segment closing or as of the date when you need to know the assets that are allocable to the segment. You go back to the earliest date where you actually do have readily determinable data, and then you use that data from, you allocate based on liabilities as of that date, and then you do what the actuaries call a roll forward, which means you simply, in bank account terms, you figure out what the deposits were, what the withdrawals were, and what the expenses charged to the account were, run that down to the present, and that gives you the amount of the assets at the time you're looking for. Okay, let's hear from Counselor Maros, please, and we'll extend your time to five minutes. Thank you, Your Honor. Thank you, sir. Thank you, Your Honor. Your Honor, Mr. Byrd argued that the Raytheon didn't have any of the readily determinable data for the segment as a separately calculate the assets for the differently situated groups of employees than the data is readily available, because we know the lion's share of the participants in the optical segment entered the plan with zero assets and zero liabilities, and that they were accruing liabilities during their entire working careers. Can I just ask, would it be enough to affirm the trial court to say there's a group of non-contributory and contributory, and maybe you did have readily available data for one of those groups, you pretty much concede you didn't for the other, and paragraph one applies only if separately calculated or calculated together, you actually have the data for everybody in the segment, and maybe there were only 19 for which you didn't, but one is all or nothing. Your Honor, I don't think it conceded that we didn't have the readily determinable data for the 19. I think our position is that it was readily determinable, because once you have the data for the non-contributory people to figure out what the contributory part is, it's a matter of subtraction, that as you pull out the non-contributory piece, all the rest of the assets in the plan belong to the contributory piece, and from that using the same ratio, you could figure out for these 19 people out of the 60,000, they get that allocable share, and so they add them together. Let me ask it slightly differently. Did you use C-5-2's ratio method to calculate for, I don't know, either the contributory or non-contributory, I can't remember. Your Honor, they did use it for the contributory piece. Okay, and then, so that non-contributory, you used C-5-1. Exactly, because for them it was very easy, because zero is a pretty easy number, and we know there's only one contribution during the entire time, so they can figure out exactly, but it's a question of, you know, if you wanted to figure out how many runs were there in the World Series, you could either Google the total number of runs, or you could add up each separate game, each separate team, you come to the same number, 41 runs, but it's, and so that's what happened here. The trial court said you had to have that data for the segment as a whole. Well, nobody who's been doing composite accounting is ever going to have that data for the segment as a whole, because by definition with composite accounting, you're computing the overall pension cost for the plan as a whole, and then just using a mathematical formula to allocate it to each different segment, so you really don't know exactly how much is going to each segment. Here, because of the unique situation where we've got a whole bunch of people, all but 19, who have zero assets, it's pretty easy. We know there's only one contribution during the entire time. It was a 55 million dollar contribution, about two and a half percent goes to this segment, about, that's about one and a half million. We know that one and a half million. How is that two and a half percent determined? Your Honor, using just the same allocation methods for the entire plan, which is the same, they're using it based on the salaries for the active employees. It's just a way of mathematically spreading it out over the total number. And it wasn't determined by figuring out the potential liabilities of the contributory people versus the potential liabilities of the non-contributory people? No, Your Honor, it's using the very same formula you do when you figure out your annual pension cost. You do it for the whole plan, you just allocate it over the segments. That's what the actuaries did here. And it's important to note that the government pension actuaries specifically approved this because they said it recognizes the employer contributions. To put that into context, so the entire time that this optical segment's in existence, that one and a half million employer contributions, during that same time, the employee contributions for the plan as a whole are 335 million. So there's this massive surplus out there of contributions that were made for other segments many years before optical was established and employee contributions. The government gets a huge windfall here by using the C-5-2 method to say, well, no, we're just going to take your allocable share of the plan as a whole. Well, of course, if the plan as a whole has a surplus, it's always going to piggyback. And so the much more accurate way to do it is if you allow them to separately calculate it for the What the government's argument was, and the trial court agreed, unfortunately, was no, you have to have readily determinable data for the segment as a whole. You can't separately calculate it. But nothing in CAS 413 says you can't. Just like nothing in CAS 413 says you can or you can't separately calculate liabilities. But both sides agree you always calculate the liabilities separately because it's every individual participant and you add them all up. Well, the same thing applies here. It's much more accurate if you've got differently situated groups of employees that you can figure out pretty much exactly what was put in for them to just add them up at the end. And that's what they did here. But the trial court said, no, you can't separate. Yeah. Quick question. What's your best answer for why we shouldn't permit what happened in Allegheny Teledyne when it came to only using CAS prospectively to let that happen here on the equitable adjustment? Let's have a quick answer to that. Yeah, Your Honor, that's interesting. In Allegheny, the offsetting equitable adjustment, there is a part of the Allegheny case where the court was talking about General Motors where they said if it's an existing obligation you have, there is no equitable adjustment. So I think the trial court actually made a mistake in the part of Teledyne that wasn't appealed where she said that this is a change in cost accounting practices entitling you to an equitable adjustment. Because under this clause, 48 CFR 52-230-2, it's only if there's a change. But because all these segment closings happened after new CAS had already taken effect, there is no change that would trigger the right to an equitable adjustment. So it's sort of a belt and suspenders. The government says, well, you said we're entitled to an equitable adjustment, but we never asserted a claim for it, but we ought to get it anyway. I'm sorry. I do have one. Have you funded the deficit yet? Your Honor, there is an unrefuted declaration in the record saying, yes, they have been funding it every year since the segment closing. Under RISA, you can't just put a huge slug of money in. They do year by year. And so every year that segment has been drawing it down. And what the trial court said is to the extent any contractor recovers the segment closing adjustment, you have to put all that money into the plan, except to the extent you've already funded it. So the amount Raytheon has been funding year after year will be offset against any amount it recovers. Otherwise, the delta goes into the plan. OK. I think we have it. Thank the parties.